You may proceed. Good morning. May it please the Court, my name is Joseph Wendt and I represent an appellant, Branch Banking & Trust Company. Because we think that these issues are similar with respect to both appellants, I intend to handle the argument unless the Court has questions from my colleague representing the other appellant, Commonwealth Land Title Insurance Company. I'd ask to reserve two minutes for rebuttal time. So we're here on a motion to dismiss as well as the merits of the appeal. All of the affected parties are parties to these appeals and we think that because the Bankruptcy Court is holding money for future distribution, that we would submit that this case is both live and not equitably moot. Unless the Court has questions about the motion to dismiss, I'd like to move to the merits of the appeal. With respect to mootness, I guess, would you concede that substantively consolidating the Rose and Lenders estate is no longer possible? I would disagree with that sentiment, with that technical fact about the estates. Does the Rose estate even exist at this point? So the argument that the Rose estate no longer exists, I think, is a fact, but I think it does not implicate the equitable mootness argument, and that's because there are proceeds held by the Bankruptcy Court. So that technical fact about the existence of the estates? But you've moved for dismissal based on constitutional mootness and equitable mootness, and so I guess I'm asking you, based on constitutional mootness, the Rose estate no longer exists. So constitutional mootness is a jurisdictional question, right? Judge Wallace, in the Mortgages I case, wrote that an appeal is not constitutionally moot where the court can give the appellant effective relief should it decide the case in the appellant's favor. There's relief here that can be granted. Well, let me ask about that, because assuming we can't grant your substantive consolidation, what is it that you think we can grant you? I'd like for you to how you think you can get the relief you want. So an order from this Court consistent with the principles of substantive consolidation would have the effect of releasing the money that the Bankruptcy Court is holding. The Bankruptcy Court is holding over $8 million for future distribution. But what's your best authority, I guess, that we can then just say, hey, you get all the $8 million, or that we can send it back to the Bankruptcy Court that says, we grant the creditor's money as relief for the Bankruptcy Court's error in denying the substantive consolidation, because that's what you've appealed on. Okay. So the best authority for that question is the discussion in Mortgages I from Judge Wallace about constitutional mootness depends on the existence of available relief. In this case, there is available relief, and that's the money that the Court is holding. It's — that relief is not even that difficult to provide. It's simply an order from the Court consistent with the principles of substantive consolidation that would result in the release of that money. There's litigation pending there. Well, there's litigation, but it's — I'm sorry. It's just interesting, because Lenders is still open, but Rose is closed. And I was just wondering if you'd ever — or if you'd found a case where a party was allowed to appeal the bankruptcy plan that had already been completely consummated and closed. So I want to make an important point with respect to that question, and that's this relief that's sought in connection with substantive consolidation does not involve the unwinding of the Rose plan. That's not what's sought here. What's sought here is the release of the money that is currently held. And that could be done and accomplished through an order entered by this Court consistent with the principles of substantive consolidation. That's effective relief that's available. What's your best case for that? Mortgage is one. That's been done. Mortgage is one. Mortgage is one where Judge Wallace says that a case is still live, that there's relief that can be granted should the Court decide the case in the — in the appellant's favor. And that's where we're at now. So we would submit that this case is not constitutionally moot for those reasons. It's a similar principle with respect to the motion dismissed on equitable mootness, that available relief is there, and that's in the form of the release of the holdback funds. On equitable mootness, did you seek a stay from this Court or from the district court? Yes, Your Honor. We — BB&T diligently sought stays, both at the bankruptcy court level and the district court level, none of which were successful. I would point out as well that the idea, the concept of the holdback funds — I'm sorry. When did you seek a stay from the district court? I think I may have missed that. When did you seek a stay? Can you cite me to ER? Yeah. I can cite to the record, Your Honor. But you can do it after you come back if you want. I don't want to take up more of your time. Okay. Yeah. So there was — there were stays sought at the bankruptcy court level and the district court level. And I have those citations in the record that I could direct the Court to. In the — in the appendix at pages 558 through 562, that's evidence of the — of the BB&T seeking a stay of the confirmation of the Rose Plan. The bankruptcy court denied it, denied that — that stay based on the sale proceeds that would remain intact in the — in the lender's case, in the lender's estate. And they would not be distributed without further court administration. When the bankruptcy court denied the motion for substantive consolidation, BB&T also appealed and sought a stay. That's in the record of the supplemental appendix at pages 18 through 27. The bankruptcy court stated that a stay would be premature at that time, stating that when the lender's plan would be confirmed, BB&T could then seek a stay of implementation of the lender's plan at that time. That's also in the supplemental appendix at page — pages 23, lines 7 through 11. When the lender's plan was confirmed, BB&T sought a stay, and that's in the appendix at page 157. The bankruptcy court also denied that motion in the appendix at page 157. So we think the record demonstrates a diligent effort to — to seek stays and to protect the — the appellate rights that exist here. I'd also point out that equitable mootness depends on the availability of effective relief, and that's here. Effective relief is available in the form of the holdback funds. Now, assuming we get to the merits, what's the standard on which we review the decision of the district judge or the bankruptcy judge not to consolidate? Inclusions of law are reviewed de novo. Factual findings are reviewed under the clearly erroneous standard. And so we would submit that there were — But the decision to consolidate, that's not abuse of discretion? The decision to consolidate is not abuse of discretion. It's de novo. Okay. And factual findings are clearly erroneous. And we submit in this case that there are both errors of law as well as a clearly erroneous factual finding. Here's my problem with your position, and this is kind of the center of where I am. Was your client in any way misled into thinking that this was really the same estate when it lent the second amount of money, the construction loan? Well, that case about the misrepresentations, about the conspiracy, is what's currently pending at the bankruptcy court. I didn't say conspiracy or misrepresentation. I said, was your client misled, or did your — maybe I'll say it this way. Did your client not understand that Lenders was a separate entity? That is correct. For the bank — Then why did your client ask for subordination of Lenders? So that subordination agreement that exists in the file dates from a time before the 2007 loan. And it's a technical aspect that it couldn't have been Rose that signed the document because Rose wasn't the one with that deed of trust. It had to be Lenders. But that's a different question as to whether or not — No, but maybe I'm misunderstanding the record. I thought what happened at the time that you made the second loan, that is to say the construction loan, the larger loan, that you asked as a condition for disbursement of funds from escrow that there be a signed subordination agreement from Lenders. Am I wrong about that? You're referring to a subordination agreement that exists in the file from a time prior to the June 2007 loan? No. I may be mistaken on the record. So if I am, please let me know. But what I thought had happened was that at the time your client or the predecessor to your client lends money or sets up to lend money on the construction loan, it says, now, we don't want the funds disbursed until we get a signed subordination agreement from Lenders. Is that correct? It's correct that the bank did not want the funds disbursed without a senior lien on the property. That's right. And did it have a specific instruction that said, we want a signed subordination agreement from Lenders? It wasn't as specific as that, Your Honor. What did it say then? It said that a senior lien on the property, a first-position lien on the property was required. But what was that tantamount to basically this subordination in deed of trust? Or a reconveyance. That's correct. So why wouldn't that be irrelevant if they were really one and the same? I mean, it comes back down to that in simple financial terms. So I'd like to understand why you think that's not the case here. From the bank's perspective, it was one economic unit in the sense that ownership was the same. So the individuals that are dealing with the bank are the same people on every side of that transaction. And so to state that they needed more money from the bank, and they knew what the conditions were to get that money, and to then show up years later and contend that they had a different understanding as to what was required to get the second loan from the bank, that's the inequitable conduct that we're addressing here. From the bank's perspective, it was all one independent, it was all one economic unit. Let me go at this one more way. Could you read to me the language that instructs, what you say is we want to be the senior lender, that I say you want a subordination from lenders. Could you read me the specific language? Yeah, it's in the deed of trust. I could do that in the rebuttal time. I don't have it here in front of me, but it is available. It's in the advances clause of the deed of trust that requires the first position lien. And it's interesting that — And it was — and that was instructions to the title company? There was both an escrow letter and language out of the deed of trust. Okay. Yeah. I'd be interested in knowing precisely what that language was. But you've already indicated that the language that directed that is basically tantamount to the subordination, right? Or reconveyance. Or reconveyance. But whether — whatever the language is, it ends up in the same place. In the same place with the bank having first rights to the money from the property. And that's what everybody expected. And that's what everybody knew at the time, that the bank would have first rights to the money from the property. What's happening now are the party's expectations are being turned on their heads. The folks that invested in a second — But it sounds as though the title company messed up. Depends on whose head. I'm not sure why you're not arguing. It's the title company that really looks like there was some problem there. And it's interesting that the title company was also dealing with these individuals that were singing the same song. The ownership of these entities was the same. They knew what the expectations were. The fact that the loan closed like that — You say the ownership is the same. We've got two different entities. Owned by the same folks. Well, I understand that. But they're two different entities. Two different entities. But the operational existence, the actual existence of lenders as a separate entity in 2007, it wasn't there. It was only after they discovered that they stood to gain a windfall that they went about pretending as if lenders did, in fact, have a separate existence. When — at every moment in time before they discovered that error, it didn't. But why was it, I guess, legal error? And I think we have to defer to the bankruptcy court here on the — being the fact-finder on the facts. And I'm just trying to figure out why it would be a legal error for the bankruptcy court to focus on the creditor with the highest claim value instead of the highest number of creditors. So analyzing Bonham in the lens — through the lens of the creditor with the largest claim ignores the principles of Bonham. Bonham is about canvassing the creditor body as a whole. It's about accomplishing equity to the creditor body as a whole. And so to consider the Bonham factors in light of the creditor with the largest claim ignores that. I don't think the court would want the opposite result where all the other creditors dealt with the entities as independent, but one creditor dealt with the big claim, dealt with the entities as a single economic unit, which would then mandate that they be consolidated. The viewing Bonham through the lens of the creditor with the biggest claim is not in conformance with the principles in Bonham. It ignores the — Do you want to reserve your remaining time? Yes, Your Honor. Thank you. Good morning. May it please the Court. Sam Schwartz — Samuel Schwartz, excuse me, on behalf of the appellees. The Court raised, I think, some very pointed questions, and so I'll try to track the questions you asked and the issues you raised. First, starting with jurisdiction. I do believe there's a jurisdictional issue here. First starting on the constitutional level, you have a confirmed Chapter 11 case. You have two actually confirmed Chapter 11 cases. Your Honor, as you asked with respect to the St. Rose case, and I typically refer to the two cases, St. Rose being the underlying property-holding entity, lenders being the second deed of trust in the 2005 transaction holder, the entity with the individual lenders in it. Turning to the St. Rose case first, that case is confirmed. And I believe that jurisdiction over that particular case ended when this Court approved the confirmation order and the appeals related to the confirmation order in the St. Rose case. At that point, now, the confirmation was final, and the order was final under the terms of the plan, meaning there were no more — no longer any pending appeals. That estate no longer existed from a bankruptcy context. The Bankruptcy Court's jurisdiction over the St. Rose estate ended. So for the constitutional jurisdiction, the ability of the Bankruptcy Court to combine those two estates, I think, has come to an end. What's to prevent the Court from reopening the St. Rose? Certainly, Your Honor, I think there would be an opportunity to reopen the case. But that's not how it exists today. I suspect, yes. But isn't that opportunity enough that there potentially — not that it would happen, but that there potentially could be that opportunity? Doesn't that take you past the constitutional mootness problem? Well, I think it could, Your Honor. I think, though, but it's not pending in front of you. So if we're talking about the facts today and not what could happen but what's happening today, it hasn't happened. Because isn't there a way to still fashion some form of meaningful relief? I mean, I think for the constitutional mootness, it seems like that's what we have to focus on, and there's still a related bankruptcy proceeding going on. And it seems like these are relatively simple estates with only, you know, the one asset, that being the property, and $8 million is still sitting in the lender's estate. So I don't think — it seems pretty clear that the appellants aren't asking to undo everything. I think they're just saying that the proceeds were wrongly distributed and that they'd like to get them. Well, I appreciate that argument, Your Honor. I think at least today from a constitutional standpoint, there is not a Rose estate. And while I appreciate a motion to reopen could occur, it has not. So moving perhaps quickly to equitable mootness, then you also have to look at the Rose estate in terms of what other creditors were paid. The Clark County Taxing Authority was paid from that estate. The U.S. trustee was paid from the disbursements that were made from that estate. The Las Vegas Valley Water District was paid from that estate. So when you look at some of the other creditors that were paid out of that bankruptcy, you could talk about unwinding potentially that transaction. Would that be inequitable? I think it's the question of equitable mootness. I think that's the better of the arguments when you start talking about the risk of unwinding the transactions that occurred in that state. Would those creditors from the Rose estate receive less if it were reopened? Well, you'd have — you potentially could have a priority scheme. So certainly — No, my question is, would they receive less? All of a sudden there's more money, and you're telling me that they would receive less? I think the taxing authority, Your Honor, had a springing lien. So they were in first. It'd be hard to argue the taxing authority would receive less. But the water — I have trouble understanding how any of them would receive less when all of a sudden there's $8 million that's potentially available. Well, no, because if you combine the estates, Your Honor, and put what would have the effect, as the Bankruptcy Court found, of putting BB&T's lien in first position because it would wipe out the lien of lenders, it would then put their deed of trust in first position. It would have an impact, I believe, on all creditors after the taxing authority. So at that point, BB&T would have to consent to the payment of those creditors who would then be behind it. So that would be the net effect of combining those estates. So it would, Your Honor, I believe, have an impact on those creditors. And any other unsecured creditors behind it, it also would have an impact on the U.S. trustee's office because the U.S. trustee is an unsecured creditor. They are paid based on disbursements. It arguably would be entitled to claw that money back from the U.S. trustee as well. There's something going on in the Bankruptcy Court now. Isn't there a proof of claim that's been filed by the appellants? There is proof of claim litigation. It's ongoing post-administration from the lender's bankruptcy. That is correct, Your Honor. So the lender's case is still open, albeit the case is confirmed. So on that level, upon confirmation, you no longer have an estate. Nevertheless, that case is still open. So I think the constitutional issues with lender's case is different than the constitutional issues with Rose's case. I think on an equitable basis, you land in the same place, save that some money has now been dispersed in lender's case, subject to the holdback that we're arguing about, the $8 million. So you have your equitable arguments, I believe, that run there. It'd be inequitable then to potentially risk a clawback. I asked Mr. Witt how this would work and what authority he had. He cited to mortgages limited as being the authority to say that we could do what he's asking. Do you agree with that? I don't agree that mortgages limited stands for the proposition that he's raising. I think mortgages limited doesn't allow for the reach that Mr. Wendt is arguing for, and I think you run into, and I apologize, Your Honor, I think it's Bullard is the case I'm thinking of, the U.S. Supreme Court, that talks about jurisdictional limits of bankruptcy courts, especially in dismissed cases, for example. It's like it never happened. So I think therein highlights the jurisdictional limits the U.S. Supreme Court has made to bankruptcy courts, and I don't think mortgage one goes quite far enough for that. So I think then turning to substantive consolidation to make best use of time. This Court's case in Bonnard said there's no uniform guideline for determining when to apply substantive consolidation. And so in looking at that, I started to think the best way to start my argument on sub-con, as I like to refer to it, is to talk about what the circuit opinions had to say. Owens Corning, the Third Circuit, said substantive consolidation is not an offensive litigation tactic. And I think as we walk through the facts here quickly, that's really what BB&T is doing, and Commonwealth, who's joined. They're using substantive consolidation as an offensive weapon in this particular case. Pacific Lumber in the Fifth Circuit said it's an extreme and unusual remedy. The Fifth Circuit, again, in Babcock and Wilcox said it's subject to heightened scrutiny. Owens Corning came back and said it's a rough justice remedy of last resort. Bonham, back to Bonham, said substantive consolidation should be used sparingly. So, Your Honor, to come back to your question about the standards, I do believe the Strand case, as we highlighted in our brief, says that this really is an abuse of discretion when we talk about the factual analysis of what went on at the bankruptcy court level. And we're here looking at clear error, that the cases come across and say that really when you look at substantive consolidation, you have a heightened standard that you have to consider. And it's a case-by-case analysis. And so here we really have to get into the weeds when you talk about is there enough to support substantive consolidation in this case? One of the weeds that would help me, if you would get into, is whether or not there was this treatment as a single economic unit. What are the facts there? Sure, certainly. So I think one of the issues that I think BB&T, one of the issues I have with how BB&T argues is that they really are conflating the 2005 transaction with the 2007 transaction. So to back up, there is an acquisition loan agreement. Colonial Bank lent money to RNS St. Rose, to the St. Rose entity, to acquire the piece of property. Later on, lenders was not a part of that particular transaction. It was not a borrower. It was not a guarantor. It did not sign on. It didn't acknowledge the transaction. What's here, what the bankruptcy court found is that lenders was created in 2005. It existed weeks before the transaction closed. And to keep the court in mind of the timeframe, we're talking 2005. The real estate market was quite frothy, as we all know, in 2005. So when this transaction came about, lenders was created, St. Rose was created. St. Rose acquired the property. Lenders then lent in with a $12 million due to trust. That's 2005. Centex had a contract to acquire the property. They walked away from their acquisition in 2006. Walked away from an $8 million deposit, actually. Walked away. That money was then later dispersed to the lenders. Go forward then to 2007, you have a new transaction, which is a construction loan agreement. And therein is where I think Mr. Wendt misstated the record. So in that gap time, Your Honor, as you mentioned, there is a modification agreement that's for the construction loan agreement to close. And when that was entered, Colonial demanded a subordination agreement from lenders. And the Bankruptcy Court found — Now, did it specifically name lenders? Correct, Your Honor. Because they saw lenders' second deed of trust and said, we can't do a modification. That could have the effect of causing the deeds of trust to swap. So they demanded a subordination agreement in connection with the modification of the acquisition loan. Then a few months after that, you have a brand new transaction, the construction loan agreement. It's brand new for many reasons. It's a new loan. Not only is Colonial Bank in it, they have a participant at this time, which is a bank called Commonwealth, that's in about a third of the loan. Brand new deal. At this point, Colonial does not ask for a subordination agreement. They do not ask for a guarantee from lenders. They don't ask lenders to sign on to the contract. Judge Nakagawa in the Bankruptcy Court said it was very clear that Colonial Bank was well aware of lenders at that time. They had a form of subordination agreement in their file, the loan file that was produced at trial. However, they never had it executed for that final 2007 transaction. And was it lenders that was supposed to — It was — it was lenders was supposed to be the party to that. It was in the file, but it was never submitted. The other part that was found both at the State — But it didn't say lenders and rows. It said lenders. Right. It said lenders. Correct. And so it also — a couple things to keep in mind. You have the findings of the state court. That state court order has gone to the Nevada Supreme Court and is final. You have the Bankruptcy Court's finding that it's very clear that Colonial was aware of lenders and that they were involved. And then when you also look, the same findings were made with respect to your question, Judge, about the loan documents for the 2007 transaction and the escrow instructions. They only say that Colonial Bank was required to get a deed of trust and a title insurance policy. Nowhere does it say they had to have a first deed of trust in the closing instructions. And if you look at the loan agreement, it doesn't say that either. And so you have the references to the record. You asked a question about closing, and I think the court properly asked, isn't this an issue that goes to the title company? And if you look at record, appellant's record, AA001924 is the escrow instructions. AA1781, 1790, and 1806 deal with the actual contracts themselves that just say deed of trust and just say title insurance. They do not give closing instructions that say first deed of trust. They do not say that. And those were specific findings both at the state court level and the bankruptcy court level, essentially coming to the conclusion that BB&T or its predecessor, Colonial, got what they bargained for. What they bargained for were a deed of trust and an insurance policy on that deed of trust. And also they bargained for guarantees. And around that, the bankruptcy court found Colonial Bank, now BB&T, got what they bargained for. They got a deed of trust, and they got title insurance. And so you can't conflate what the parties expected in 2005, which is really what they're arguing for now. Give us what we got in 2005 because that's what we should have gotten in 2007, should have received, excuse me, in 2007, as opposed to what really what should have happened in 07. And that's where the bankruptcy court, I think, dug in and said, no, I'm looking at what the parties expected in 2007. And that's where the interests change. And when you look at those expectations, as the court said, then substantive consolidation is not justified here. So a few of the things, I think, to come back to the Owens-Corning argument that substantive consolidation is not to be used offensively. And I think that's really, it's an offensive litigation tactic is what's being done now. This would, what this would do if it was granted, if the court were to remand with instructions. It would fix Nevada Title's error, one of the things that we raised. It would fix the title company's error. It would fail to take into the expectations of the parties after the 2007 deal, meaning that the lenders, creditors, would be paid from the sale of the property, which is what they're still waiting to do. And that BB&T would be paid from the sale of the property. And if it wasn't, it had title insurance for that and guarantees.  That the expectations of all creditors would not be met and that substantial harm would be done to lenders and its creditors. And that substantive consolidation is not designed to create substantial harm to parties. It's to give an equitable result as best it can to all. And this would create substantial harm. So then I think as a closing point, what I would like to highlight for the court quickly is that one of the last points that BB&T raises is that the court made an error in finding that the largest creditor was controlling in this set of facts. And I think here, not only does the Bankruptcy Code give some precedent for that in Section 1126, which says when you classify creditors, you have to have two-thirds in dollar amount that vote in a particular class, or that class doesn't accept the plan. So the Bankruptcy Court equitably and statutorily says you have to give greater weight to dollars. And I think the Bankruptcy Court did that in saying 76% of the debt thought these were separate units. When you look at the cases, Waksberg, LLS America, Lodger, Big Sky, and Augie Restivo, they all take into account the varying size of the creditors and highlight that Judge Nakagawa's decision process in looking at the size of the creditor who was owed the most money and the expectations of the parties did not justify substantive consolidation in this case. I have one quick question for you. These are two appeals that are before us, and I just would like to get your thoughts on any disposition and whether we would need to issue separate dispositions or just one. I think, Your Honor, perhaps the parties will here consent to one form of order, perhaps, for both of them. I think I believe they essentially are identical appeals that are in front of you and identical answering briefs. If the parties were not to consent, I think we would need two forms of order to that point. Unless the parties were to consent to some form of consolidation, I can say in the interest of judicial economy, the appellees would not oppose a consolidated order if that were the preferences of the court and if the appellants were to consent. Thank you. You have about a minute and a half, and you might address at first your view on the consolidated order. So one form of order is acceptable to our side, that the issues are similar, and that order, if it's consistent with principles of substantive consolidation, would have the effect of releasing that money, and so there would be no need for an additional or second order. Thank you. I would point out that the opponents of substantive consolidation here are trying to use the fiction of lenders as a separate entity to shield a monetized asset from BB&T to deprive the bank of the security that it expected to have in 2007. In the opening argument, the court asked for a citation to the language from the loan documents about the seniority of the lien that BB&T required or Colonial required at the time, and it's in the record at page 1882.11. It states that evidence is acceptable to lender that the lien of lender's deed of trust constitutes a first lien upon that portion of the property for which a construction disbursement is requested. That's what the bank wanted. That's what the bank expected to have. There's also testimony in the record from the bank representative. But the bank never got it. The bank did not get it. That's correct. And when that discovery was made, when that error – And when you say the bank expected it, what the bank expected was a subordination agreement out of the entity lenders. I would submit that – And it didn't get it. The bank did not get that. But it understood that lenders did have a deed of trust as against the property. It understood that a deed of trust was there, but to state that that meant that there were two separate entities with separate assets, we would submit that that's not what the record supports. From the bank's view, these were the same people that needed more money from the bank, and they were telling the bank that they would be paid out of the proceeds from the property. Well, then why – if they thought it was the same people and they were identical, why in the world did they ask for a subordination agreement from lenders? Simply because that encumbrance was there. It's a technicality. It had to be lenders because that was the name on that deed of trust. But that's a different question than whether the bank treated these entities as separate and independent economic units. Well, whether you treated them that way or not, you understood sufficiently that there was an issue that you asked for a subordination agreement. And we would submit that that issue was present, but that's a different question than whether they treated them as separate. Okay. Thank you. Thank you, Your Honor. The case of Branch Banking and Trust v. R&S St. Rose Lenders is submitted. Thank you both for the briefing and the argument this morning.
judges: McKeown, W. Fletcher, Murguia